

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-12-00141-CR

SYLVESTER KELLY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 41,078-A

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

# OPINION

Sylvester Kelly, after being found guilty of aggravated robbery and after the presentation of enhancement evidence, was sentenced to fifty years' incarceration. Kelly filed an appeal, and his appointed appellate attorney filed a brief and motion to withdraw in compliance with *Anders v. California*, 386 U.S. 738, 743–44 (1967).[1] As required by *Anders*, the appellate attorney advised Kelly that he had a right to raise his own points of appeal should he determine that some existed. However, the attorney advised our Court that he had made a review of the record at the Gregg County Clerk's Office and that he did not have a copy to provide to Kelly for his perusal. Kelly requested this Court to supply a copy of the record to him, but having only our (rather voluminous) one, we denied the request. After the appropriate time, we reviewed the record, found no meritorious grounds for relief, affirmed the conviction, and allowed counsel to withdraw. The Texas Court of Criminal Appeals reversed our opinion (finding we erred in failing to supply Kelly with a copy of the record after Kelly had requested us to do so) and remanded the case to us with specific instructions regarding the course of action to take when confronted with *Anders* briefs.[2] Our Court has now duplicated its own copy of the record of Kelly's trial and provided it to him. Kelly has filed a pro se brief. After reviewing Kelly's arguments and the applicable law, we affirm the trial court's judgment and conviction.

---

[1]*See also Stafford v. State*, 813 S.W.2d 503, 509–10 (Tex. Crim. App. 1991); *High v. State*, 573 S.W.2d 807, 812–13 (Tex. Crim. App. [Panel Op.] 1978).

[2]*Kelly v. State,* 436 S.W.3d 313 (Tex. Crim. App. 2014).

## I.    Facts

In the early morning hours of October 30, 2011, as two men sat in an automobile outside The Main Event (a Longview nightclub), a man approached the car and tapped on the window. The man then shot out the window of the car with a gun, reached into the car, and took the wallet of one of the car's occupants. Kelly was identified as the perpetrator of this act and was convicted at trial of aggravated robbery. On appeal, Kelly raises several points. He (1) challenges the sufficiency of the evidence, (2) claims that both his trial counsel and appellate counsel failed to provide effective assistance, (3) asserts that the State offered perjured testimony, used an impermissibly suggestive identification procedure, and conducted an improper investigation, and (4) alleges that the State committed prosecutorial misconduct during closing arguments.

## II.    Sufficiency of the Evidence

In evaluating legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of *Brooks*, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

3

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

Under the hypothetically correct jury charge, the State was required to prove that Kelly, while in the course of committing theft of property and with intent to obtain or maintain control of that property, did intentionally or knowingly threaten or place Michael Boyd in fear of imminent bodily injury or death while using or exhibiting a deadly weapon. *See* TEX. PENAL CODE ANN. § 29.03 (West 2011).

Kelly's attack upon the sufficiency of the evidence is grounded in the testimony of the robbery victim, Boyd (who failed to conclusively identify Kelly as the robber). However, there was other circumstantial evidence strongly pointing to Kelly as the culprit.

Boyd and a friend, Audrey Morrow, Jr., were sitting in a car about 3:00 a.m. October 30, 2011, in the parking lot of The Main Event. According to their testimony, the two men were sitting in the car as they drank, smoked marihuana, and listened to music as they debated about whether to go into the club. Boyd observed a person wearing a yellow hoodie sweatshirt come across the street and go to a truck belonging to someone he knew. Although Boyd thought this a bit "strange," his attention was diverted by the conversation with Morrow. Boyd said that the hoodie-clad person then tapped on Boyd's car window with a pistol. Boyd described what happened next: "I looked at him, I kind of gave him like a go-on motion, and he fired the pistol." Boyd said he "jumped

4

like between the seats and [] lay still thinking maybe if he thought I was dead he wouldn't shoot anymore." The assailant reached into the car and took Boyd's wallet, which Boyd said contained $490.00.[3] Morrow's version of the event was quite similar; he said that someone came to the car window and gave an "unusual knock" which he thought might have been with a gun, then shot out the window. Morrow (who was "wanted" by the police and did not want to be around when the police arrived) got out of the car and walked away.

After a "couple seconds," Boyd said he "jumped out of the car" and saw his assailant cross the street "and get into a brown sedan" or what he also described as a "brown Lincoln four door." Morrow's version contrasted only a bit because he described the car the assailant entered as being a dark yellow car. Boyd saw no one else enter the car. Police were already responding to an unrelated report of a person with a gun at The Main Event,[4] so Boyd saw police approaching even as he watched his robber cross the street and get in the car. Boyd told the arriving police he had been robbed; he stated, "It couldn't have been a whole minute" between his having watched the robber in the yellow hoodie cross the street to the brown Lincoln and his alerting the police. When asked by the State if "it was pretty immediately afterwards" that Boyd saw the suspect leave the scene and Boyd talked to the police, Boyd said, "It was enough [time] to probably walk from here to the back of the court."

---

[3]Boyd particularly remembered this specific amount because he was carrying that very sum which he intended to use the next day to pay a bill or bills owed by his mother.

[4]Longview Police Officer Steven Bryand said that according to the results of his investigation, there was no link between the report prompting police presence and the Boyd robbery.

5

Bryand testified that he was dispatched to a report of a person with a gun inside the nightclub. As soon as he parked his car, a black male (whom Bryand identified as Boyd) came to Bryand to inform him of the robbery. Bryand related that Boyd pointed out the car which he said he had watched the robber enter and told Bryand that the robber was still in the car so Bryand sent another officer, Ryan Gibson, to investigate. Gibson said he found Kelly in the back passenger seat of a tan, four-door, Lincoln Town Car. Gibson identified himself and told Kelly to show his hands and exit the vehicle. Instead, Kelly "reached down towards the . . . front passenger seat as if he was reaching for something or stuffing something." Kelly then exited the vehicle. Under the front passenger seat (in the same area where he had observed Kelly lean), Gibson found a .40 caliber Glock pistol. On the passenger seat next to Kelly was a yellow hoodie sweatshirt. The State showed that a shell casing located on the ground beside Boyd's automobile had been fired from the same pistol found in the car where Gibson found Kelly.

Neither Boyd nor Morrow could identify Kelly as the man who shot the window and robbed Boyd. Boyd said he could not see the person's face because of the hoodie, but as he saw the robber walk away, he noted a memorable characteristic: "the way he walk[ed]." The walk reminded him of Sylvester Gray, a person with whom Boyd had gone to elementary school. At trial, Boyd identified Kelly as the person he had known as Sylvester Gray. Officer Gibson also said that when he first contacted Kelly, he identified himself as Sylvester Gray. The indictment named the defendant as Sylvester Gray, but there is an interlineation changing the surname to Kelly and a note reading "changed at suggestion of defendant that Kelly is his correct name" that was signed

6

and dated by the trial court.[5]  Gibson testified he had been able to identify the defendant as using both the Sylvester Gray and Sylvester Kelly names.

Gibson said he questioned Kelly, and the trial court admitted a recording of that conversation.  Kelly told Gibson he had been dropped off at the night club by a woman who went to get a motel room and indicated that the woman was supposed to return to pick him up.  He said the lady's name was Sidney, but did not know the lady's last name or her telephone number.  He said he got into the car because he was cold, and he denied having a gun.  He told Gibson the $490.00 in his pocket had been earned at his job.

Summarizing the evidence, we find at least these things that implicate Kelly as the person who robbed Boyd:  (1) very little time passed from Boyd watching the robber cross the street to enter a car and the police finding Kelly in the car; (2) the pistol, which ejected a shell located near Boyd's car, was found in the same vehicle in which Kelly was located; (3) a yellow hoodie jacket (like that worn by the assailant) was also found in the car with Kelly; (4) Boyd's wallet, absent any cash, was located by the police less than twenty feet from the car in which Kelly was found; and (5) Kelly had $490.00 in his pocket, the same amount of money Boyd said was taken from him.  Although neither Boyd nor Morrow were able to identify Kelly's face as belonging to the assailant, Boyd was able to liken the walk of his assailant to that of a former school acquaintance whom he knew by a different name, but it developed that Kelly had previously used that same

---

[5]Kelly also acknowledged Kelly to be his correct surname at trial and when waiving arraignment.

7

name. Plainly, there was sufficient evidence upon which a rational jury could have found, beyond a reasonable doubt, that Kelly committed the aggravated robbery with which he was charged.

We overrule Kelly's first point of error.

## III. Ineffective Assistance of Counsel

Kelly claims that his counsel failed to provide constitutionally effective assistance of counsel.[6] To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient, and (2) the defendant was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Ineffective assistance of counsel claims must be firmly rooted in the record, with the record itself affirmatively demonstrating the alleged ineffectiveness. *Lopez v. State*, 343 S.W.3d 137, 142–43 (Tex. Crim. App. 2011). Failure to satisfy either prong of the *Strickland* test is fatal. *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006). Thus, we need not examine both *Strickland* prongs if one cannot be met. *Strickland*, 466 U.S. at 697.

We indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance and that it was motivated by sound trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). "If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002).

---

[6]*See* U.S. CONST. amend. VI.

Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing an evaluation of the merits of ineffective assistance claims. *Thompson*, 9 S.W.3d at 813. "In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect" the reasoning of trial counsel. *Id*. at 813–14. Only in the rare case "in which trial counsel's ineffectiveness is apparent from the record" may the appellate court "address and dispose of the claim on direct appeal." *Lopez*, 343 S.W.3d at 143.

Kelly raises several allegations which he claims demonstrate trial counsel's ineffectiveness. He avers that trial counsel failed (1) to locate witnesses to offer exculpatory evidence, (2) to challenge the chain of custody of the cash found in Kelly's pocket, and (3) to file certain motions (including a request to declare a mistrial and a request for a limiting instruction as to one witness' testimony). Kelly's claim that appellate counsel was ineffective is limited to his claim that appellate counsel should have made a claim that trial counsel provided ineffective assistance. Although as couched, Kelly's claim obviously presents a multifarious argument, we nevertheless address those claims in the interest of justice. *See* TEX. R. APP. P. 38.1; *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010).

Kelly first argues trial counsel's ineffectiveness was shown by his failure to "find and interview any potential witnesses to ascertain whether their testimony would have aided Appellant[']s alibi or innocence defense." Kelly claims that "the driver and passenger of the car the appellant was arrested in were extremely relevant witnesses[] [a]nd their attendance at trial was very important." But Kelly neither identifies these witnesses (if, indeed, they exist), nor even postulates speculation about what testimony they could have provided, nor relates how any such

9

testimony would have assisted in his defense. Where a defendant cannot establish these matters, he fails to demonstrate harm as required by *Strickland*. *See Ex parte McFarland*, 163 S.W.3d 743, 757–58 (Tex. Crim. App. 2005) ("Applicant has failed to name any specific witnesses . . . whom his attorneys should have contacted or called as mitigation witnesses. Likewise, he has failed to show that these unnamed witnesses were available to testify or that their testimony would have benefitted him. Therefore, he fails to show prejudice.").

Kelly next alleges that trial counsel was ineffective because counsel was "unaware of the chain of custody involving the currency that was admitted . . . [,]" i.e., the $490.00 that was found in Kelly's pocket, which the State suggested was the same $490.00 taken from Boyd's wallet. According to Kelly, this demonstrates counsel's "failure to conduct any pretrial discovery." First, if there is a missing link in a chain of custody, the break in that chain affects the weight given to the evidence, rather than affecting its admissibility. *See Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989). Second, the currency found on Kelly was only a part of the circumstantial case built against him.[7] Finally, there is nothing to support Kelly's broad, conclusory allegation that trial counsel failed to conduct pretrial discovery. Absent contrary evidence, we presume counsel provided sound, reasonable representation. Also, there is nothing presented by Kelly to say why this currency would not have been admissible. We find no evidence of ineffective representation under this line of attack.

_____

[7]The cash and wallet were returned to Boyd at the scene. Photographs of the wallet and identification card were admitted into evidence without objection.

10

Next, Kelly argues that trial counsel should have moved for a mistrial, but it is not clear upon what ground Kelly feels a mistrial was warranted. After his argument about the chain of custody for the $490.00, Kelly makes the following statement in his brief:

Due to the turning over [of] the confiscated currency to the alleged victim at the scene of the offense, without any proof of ownership [sic] . . . , and also failed to prevent the testimony of the alleged eyewitness from being admitted. [Trial counsel] failed to request and [sic] instruction to disregard[,] and he failed to request a mistrial. If trial counsel would have filed a motion in limine[,] alleged eyewitness testimony w[h]ich gave [the] jury [a] false impression would not have been admitted into evidence. Had trial counsel been functioning effectively, this testimony would not have been admissiable [sic] due to no evidence admitted at appellant's trial or in the record gives proof to Aubrey Marrow [sic] being a[n] actual eyewitness to the offense Appellant was charged with.

Kelly also claims trial counsel should have requested a limiting instruction as to Morrow's testimony. Kelly cites no authority on this point and provides no explanation as to why a motion for mistrial or limine or a limiting instruction should have been requested as to the currency or to Morrow's testimony. This argument is inadequately briefed, and we decline to address it. *See* TEX. R. APP. P. 38.1(i); *see also Bell v. State*, 90 S.W.3d 301, 305 (Tex. Crim. App. 2002) (appellate court will not make legal arguments for appellant, where no specific legal arguments and authority are presented).

Kelly claims his trial counsel failed to investigate or challenge Kelly's prior convictions, which were admitted at punishment, and claims these convictions were void because they were obtained while he was without the benefit of counsel. The State admitted seven prior convictions: five Texas misdemeanors, one Texas second degree felony, and one federal felony. Four of the misdemeanor judgments state that Kelly intelligently, knowingly, and voluntarily waived his right

11

to counsel, after being warned of the hazards of self-representation. The judgments reflecting the other misdemeanor and the Texas felony convictions state that Kelly was, indeed, represented by counsel. Although the judgment reflecting the federal conviction does not expressly state that Kelly was represented by counsel, it does recite that Kelly was found guilty on one count after a plea of not guilty. While there is no conclusive indication that Kelly was represented by counsel in the federal matter, neither is there any waiver of counsel. An indigent defendant has a right to appointed counsel in a federal criminal proceeding, unless the defendant waives that right. *See* FED. R. CRIM. P. 44. Absent some evidence to the contrary, we presume that trial counsel investigated the State's evidence of prior convictions and made competent decisions on whether to challenge that evidence.

In the last of his list of complaints about his representation, Kelly claims that his appellate attorney was ineffective for failing to raise a point of error alleging trial counsel's ineffectiveness. Because we have found nothing in Kelly's various claims to rebut the presumption that trial counsel operated competently with a sound trial strategy, we cannot find that appellate counsel should have raised this point of error on appeal. Kelly has failed to meet the requirements of *Strickland* on his various complaints about the legal representation he received.

We overrule his second point of error.[8]

---

[8]From our review of the record, we can discern a defensive strategy of suggesting that someone else robbed Boyd. Trial counsel stressed, in cross-examination, the criminal histories of Boyd and Morrow. He had Boyd recalled to the stand where Boyd acknowledged having originally given an inaccurate representation of the circumstances surrounding one of his prior convictions. In closing argument, Kelly vigorously attacked the credibility of Morrow and Boyd. Counsel pointed out that one of the testifying police officers made a mistake as to the color or style of Kelly's shirt when the officer made an in-court identification: Gibson initially pointed out Kelly, in court, as wearing a "light blue t-shirt"; when asked to clarify, he said Kelly was in a "striped blue shirt, button-up shirt." He pointed

12

**IV.    There is No Evidence that the State Presented Perjured Testimony**

Kelly also claims that his appellate counsel erred to file an *Anders* brief where the record "clearly shows the State['s] use of perjured or falsified evidence." Kelly argues that Morrow (the man who was sitting in the car with Boyd when the window was shot out and Boyd was robbed) committed perjury when Morrow claimed to be an eyewitness to the robbery. However, Morrow did not claim to have been an eyewitness to the robbery; rather, he clearly only testified to what he actually observed and did not purport to say that he saw Kelly fire the gun or take Boyd's wallet. Kelly offers no distinction between what he believes is meant by eyewitness versus witness.[9]

As summarized above, Morrow said he was in the car with Boyd, outside The Main Event nightclub. Morrow acknowledged drinking beer and smoking marihuana at the moment of or shortly before the robbery. He acknowledged being "wanted" for a community supervision violation at the time. Thus, even though a police officer said he wanted to talk to Morrow, Morrow left the scene. More importantly to Kelly's appellate argument, Morrow never claimed to have seen the face of the robber or to be able to identify him. Morrow only said that someone shot out the window of the car; he thought Boyd said his wallet had been taken; Morrow fled the car and eventually the scene; and he saw someone—Morrow did not say this someone was the robber—

---

out repeatedly that officers were called to investigate a report of a person with a gun at The Main Event and that Kelly had no keys to the car in which he was found. He got one police officer to say that a man came from the night club, and asked what police were doing around the Lincoln in which Kelly was found. The officer suggested that the man may have claimed ownership of the car; but police did not take the name of this person.

[9]"Eyewitness" is defined as "one who sees an occurrence or an object; *esp*: one who gives a report on what he or she has seen." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 446 (11th ed. 2006). "Witness" is defined, in relevant part, as "one that gives evidence; *specif*: one who testifies in a cause or before a judicial tribunal" or "one who has personal knowledge of something." *Id*. at 1439.

walk across the street and get in the passenger side of a dark yellow car. Morrow expressly said he did not see the shooter's face and did not remember what he was wearing. There is nothing in the record to suggest that Morrow committed perjury. He was a fact witness, and the jury was free to believe or disbelieve any or all of his testimony.

Kelly claims his trial attorney erred "in not taking notice of the fact that there was no mention in Officer Bryand, Steven or Officer Gibson, Ryan offense report pertaining to their observation of the scene or the victim statement, of any person being a passenger or was an eyewitness to the committed act." The offense reports are not in the record, so we have no way of knowing if Kelly is correct about their contents. Trial counsel did cross-examine Gibson about his report having no indication that Kelly was found with keys to the car in which he was sitting. We find no error in admission of Morrow's testimony or in appellate counsel's decision not to raise some point of error regarding Morrow's testimony.

**V.     Boyd's Identification**

In his fourth point of error, Kelly claims that he was "subjected to unduly suggestive pretrial identification procedures." Kelly asserts that Boyd "stated that he was told by the police who he should identify," citing to the fourth volume of the reporter's record, page 106, lines 17 through 24. To provide context, we quote this passage as well as some of the questions and answers before and after Kelly's citation, which appears in italics:

> Q.     [By Defense Attorney]  And then you thought from the way he walked it was Sylvester Gray, but you didn't tell the police that that night, did you?
>
> A.     [By Boyd]  I couldn't positively ID him, no.

14

Q.	You didn't tell the police that.  You didn't --

[The State objects]

Q[.]	[By Defense Attorney] *In fact, you never said anything to anybody about you thinking it was Sylvester Gray until you found out that's who they charged with this crime; isn't that true?*

A.	[By Boyd] *No, they were saying his name that night.*

Q.	*They were saying his name that night and you didn't tell the police?*

A.	*That's who was saying his name.*

Q.	And you didn't tell the police, "Yeah, that's who it was."  You didn't tell them that, did you?

A.	I didn't want to make a false statement, so, no, I didn't tell them that.

Q.	Oh, thank you.  You didn't want to make a false statement.

A.	Yeah, I didn't see his face.  Why would I tell them I seen his face when I didn't?

Q.	Okay.  So you didn't want to make a false statement and say it was Sylvester Gray?

A.	No.

Q.	Correct?

A.	No.  I thought they caught him red-handed so I wouldn't have to say anything.

We cannot see how this line of questions and answers establishes that Boyd was "told by the police" to identify Kelly as the robber.  This testimony is consistent with Boyd's earlier testimony

15

that he did not see the robber's face. Instead, Boyd testified that he saw the robber walk across the street and thought he recognized the robber's gait.

We overrule this point of error.

## VI.     Kelly Criticizes the Investigation

In his fifth point of error, Kelly claims the investigation by law enforcement was "so contrived that it created false testimony." Kelly points out what he views as discrepancies or weaknesses in the State's case, most of which were addressed by trial counsel. In another questionable reading of the record, Kelly claims Boyd and Morrow must have felt obligated to identify Kelly as the robber. According to Kelly, they were "[e]ssentially . . . given a choice to identify the apprehended subject or nobody at all." In support of this, he cites Boyd's testimony, quoted above, that he "thought they caught him red-handed so [he] wouldn't have to say anything." It would seem impossible to discern (and Kelly does not explain) how this testimony indicates that Boyd and Morrow were compelled to identify Kelly as the assailant. Indeed, as pointed out above, neither witness identified Kelly as the robber. Rather, each of the men indicated that they saw someone walk across the street and get into a car, this being followed on the heels by the arrival of the police and Boyd pointing out the destination of the robber (that destination being the automobile where Kelly was promptly found).

During cross-examination, trial counsel pointed out that the police failed to sample Kelly's hands for gunshot residue, that they failed to note the name of the man who came out of the club and indicated that he was the owner of the car in which Kelly was found, that Boyd could not recall the bill he was to pay with his mother's $490.00 he testified had been taken, and that Kelly's

16

fingerprints were not found on the pistol discovered in the automobile with him. The jury was free to weigh the credibility of the witnesses, to resolve inconsistencies in the testimony, and to ascribe whatever weight they felt appropriate to each witness' testimony. *See Hooper*, 214 S.W.3d at 13; *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). That is the province of the trier of fact.

We overrule this point of error.[10]

## VII.    No Prosecutorial Misconduct in Closing Argument

In his final point of error, Kelly argues that the State presented improper argument, thus engaging in prosecutorial misconduct. We do not agree and overrule this point of error.[11]

Permissible jury argument falls into one of four categories: "(1) summation of the evidence, (2) reasonable deduction from the evidence, (3) an answer to the argument of opposing counsel, and (4) plea for law enforcement." *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008).

As above, we will quote more than the section of the record to which Kelly cites to provide context, and the statements Kelly claims were impermissible are italicized:

> Let me first start the way we all should start and just thank you for your
> service to the court. Without you[,] this doesn't happen. Without you justice is not

---

[10]Kelly argues, "The State resisted all effort to obtain statements from owner of car. . . . State resisted all effort to obtain photos of driver and passenger . . . for identification purpose." His trial counsel established these facts in questioning Officer Gibson. The jury was able to consider the extent and thoroughness of law enforcement's investigation.

[11]Again, Kelly has presented a multifarious argument, making several complaints within this point of error. In the interest of justice, we will address his various complaints. Also, unless indicated specifically, no objection was lodged to any of the complained-of statements.

17

served today.  *Without finding Mr. Kelly guilty today justice will not be done.*  And that's why you're here; that's why you're in those seats.

This was the beginning of the State's closing argument, and the complained-of statement amounted to the State asking the jury to provide law enforcement.  Thereafter, the State went on to summarize the evidence, and this sentence also announced what could be deemed a reasonable deduction from the evidence the State was about to summarize.  We find nothing improper in that statement.

The State then explained the jury's deliberation process, going on to recount that they would retire to a room and select a foreperson and that they could send notes or questions to the trial court or request any piece of evidence they wanted.  Discussing the firearm analysis testimony (which showed the empty shell casing found outside Boyd's car was fired from the Glock pistol found in the car with Kelly), the State said,

> You get all of that.  Right?  And you get to inspect it and examine it.  And at the end of that inspection and examination, you find Mr. Kelly guilty because he is guilty.
> When you go back in that room you take your reason and your common sense with you.  You take your whole life with you.  Your life experience goes back there with you.  Right?  We don't become some conspiracy theorists and try to make things up back in that room.  We take what we heard in this courtroom, *we apply our life experience to it, and then we know that Mr. Kelly is guilty*.  Right?[12]

The State had recently summarized the evidence, and the statement of which Kelly complains asked the jury to make a reasonable deduction from the evidence.  It was not improper.[13]

---

[12]Again, the language about which Kelly complains is in italic.

[13]Kelly also claims in his brief that "[t]here was no mention in these statements as to the evidence being the reason for a guilty verdict."  He claims these remarks reflected the prosecutor's personal belief.  We do not agree.  The complained-of remark was made after the State summarized key points of evidence.  Likewise, when Kelly asserts that "[t]here was no evidence admitted during trial or in the record showing that the currency that was introduced into evidence, and the wallet that was introduced into evidence [were] connected with each other," this argument is not an

18

Next, Kelly "contends that it was improper for the prosecutor to bolster the state witness testimony by injecting into the argument her personal opinion about his honesty and truthfulness." Kelly cites (but does not quote) two sections of the reporter's record. First, volume 4, page 50, lines 19 through 25:

> Then you saw [Michael Boyd] when I asked him, but could you identify the defendant? I could tell he did not want to answer me. You could tell by his countenance he did not want to say that. He did not want to tell you that, "Yes, I can identify Sylvester Kelly, and I can identify him by his movement. When he was walking across the street, the way he carried his body, I knew who that was." He didn't tell the . . . .

Second, volume 4, page 51, lines 3 through 5. We quote before and after Kelly's citation, which is italicized, for context:

> And what did [Boyd] tell you about that? He said, "He was caught redhanded, so I didn't think I was going to *have to say anything." I wouldn't want to testify against Sylvester Kelly. He looks like an extremely scary man. So if he was going to lie, wouldn't he have lied about that?* That's what matters.

We cannot see how this constitutes an expression of the State's personal belief regarding Boyd's honesty and truthfulness. At most, it is a rhetorical device where the State argued that if Boyd had actually been fabricating his testimony, it was more logical that he would make up a lie that conclusively identified Kelly as the robber. Further, this statement was made in the State's rebuttal argument, after Kelly's attorney attacked Boyd's credibility.

---

entirely correct representation of the testimony. Neither the wallet nor currency was admitted into evidence, but photographs of the money and wallet were. Officer Gibson returned them to Boyd at the scene. Gibson said the wallet had Boyd's identification in it, and $490.00 in cash was found in Kelly's pocket. Gibson identified photographs of the wallet and Boyd's identification as those he found at the scene, and Boyd identified the photographs as those of his property. These are pieces of circumstantial evidence pointing to Kelly as the robber.

It is improper argument to suggest a witness is afraid of the defendant absent supporting evidence in the record. *See Johnson v. State*, 662 S.W.2d 368, 369 (Tex. Crim. App. 1984). The State's allusion to Kelly looking like "an extremely scary man" may well have been improper. We cannot know what body language Boyd displayed on the stand, but there is nothing else in the record to establish he had a reason to fear Kelly. If that part of the State's argument was improper, it was not preserved. At the risk of giving an advisory opinion, we note that even had that error been preserved, we would have found it harmless beyond a reasonable doubt. Improper jury argument is non-constitutional error and is disregarded unless it affects the defendant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011). Such harm is gauged by balancing the severity of the misconduct, any curative measures, and the certainty of the defendant's conviction without the misconduct. *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000). The State's improper statement was not egregious. It was short, not emphasized, and the State turned immediately to answering the defense's theories and arguments and to summarizing the evidence. No objection having been lodged, no curative measures were applied. Kelly's conviction was much more likely secured by the strength of the State's case as recounted above. The State's comment, if it was error and if it had been preserved, would have been harmless.

Kelly next argues that the State "bolstered a state witness[,] testimony who the record clearly shows lied about being a witness to the offense, . . . when she injected into the argument her personal opinion about Morrow's honesty." For this, he cites volume 4, page 17, lines 14

through 18 of the reporter's record. There, the State was questioning Bryand about his conversation at the scene with Boyd:

> Q.    [By State's Attorney]  Okay.  Did you talk to any other witnesses in that -- from that scene?
>
> A.    [By Bryand]  No, ma'am.  There was some other gentlemen standing around, but none of the -- nobody else said they witnessed anything.

Kelly does not explain, and we cannot discern, how this has anything to do with Morrow or serves to inject the State's opinion about the honesty of any witness.

Finally, Kelly claims that the State "injected into argument remarks that call to absence of evidence wich [sic] only Appellant could have supplied," or the State commented on Kelly's failure to testify.  He cites to the following remarks in the State's closing argument:

> Who is this mystery girl who dropped Sylvester Kelly off [at] the club that night? Where is she?  Why didn't she come tell us anything?  They have subpoena power. Is it because she doesn't exist?  She doesn't have a last name.  Sylvester Kelly apparently just met her that night; doesn't know her number.  Right?  I mean, you heard Sylvester's story.  He told it to us.  Who is the mystery girl?
> Where did the mystery shooter go?  Mr. Kelly said, "I never went in the club," he was there the whole time then.  Right?  He must have seen it all happen. He was in the car where the gun was and the hoodie sitting right next to him, so he must have seen the man who did shoot come and stuff that gun under the passenger seat.  After all, the gun matches the shell.  Where is the mystery shooter?

Where an argument points out the defense's failure to call a witness and it is claimed that such argument constitutes a comment on the defendant's failure to testify, we examine the argument "from the standpoint of the jury, and the implication that the language used had reference to such failure to testify must be a necessary one." *Ladd v. State*, 3 S.W.3d 547, 569 (Tex. Crim. App.

21

1999).  Here, the State was pointing out holes in Kelly's defensive theory.  This was not an improper argument.  *See id*.

We overrule the sixth point of error.

On original submission, we found appellate counsel's *Anders* brief to have been appropriately filed, and we granted his motion to withdraw.  In reversing our decision, the Court of Criminal Appeals held that we "erred to grant appointed counsel's motion to withdraw and declare the appellant's appeal to be frivolous without first satisfying the appellant's express request to gain access to the appellate record in order to meaningfully respond to the *Anders* brief."  *Kelly*, 436 S.W.3d at 322.  After ensuring Kelly was able to review the trial record, we were instructed to "revisit [our] review of appellate counsel's *Anders* brief and motion to withdraw in light of the appellant's revised response, if any, and any response from the State."  *Id.*  After reviewing Kelly's brief, we find no reversible error.  We grant appellate counsel's motion to withdraw.  While we found possible error in one of the State's closing arguments, the potential error was not reversible error, and we cannot say that the *Anders* brief was inappropriately filed.  Regardless, Kelly has had an opportunity to present his arguments and receive this Court's review of his trial.

We affirm the trial court's judgment and sentence.[14]

Bailey C. Moseley
Justice

Date Submitted:     March 26, 2015
Date Decided:       May 6, 2015

Publish

---

[14]Should appellant wish to seek further review of this case by the Texas Court of Criminal Appeals, appellant must either retain an attorney to file a petition for discretionary review or appellant must file a pro se petition for discretionary review. Any petition for discretionary review must be filed within thirty days from either the date of this opinion or the date on which the last timely motion for rehearing or for en banc reconsideration was overruled by this Court. *See* TEX. R. APP. P. 68.2. Any petition for discretionary review must be filed with the clerk of the Texas Court of Criminal Appeals. *See* TEX. R. APP. P. 68.3. Any petition for discretionary review should comply with the requirements of Rule 68.4 of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 68.4.