In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO.  09-15-00017-CR
_____

### BOBBY LYNN WALTERS SR., Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 13-12-13363 CR**

### MEMORANDUM OPINION

Appellant Bobby Lynn Walters Sr. (Walters) appeals the revocation of his deferred adjudication community supervision. In a single issue, Walters argues that the evidence is legally insufficient to support the trial court's finding that he violated certain terms and conditions of his community supervision. We affirm the judgment of the trial court.

FACTUAL BACKGROUND

On December 17, 2013, Walters was charged by information for indecency with a child by sexual contact. The child was his eleven-year-old granddaughter. Walters pleaded guilty, and on August 19, 2014, the trial court deferred adjudication of his guilt and placed him under community supervision for a period of four years. Walters signed the Conditions of Community Supervision under the statement that read "I HAVE RECEIVED A COPY, READ AND UNDERSTOOD THE ABOVE TERMS AND CONDITIONS OF COMMUNITY SUPERVISION AND AGREE TO ABIDE BY SAME." That same day, Walters also signed a document titled "SUPPLEMENTAL ADMONITIONS TO THE DEFENDANT FOR SEX OFFENDER REGISTRATION REQUIREMENTS[.]"

On September 19, 2014, the State filed a motion to revoke Walters' community supervision and adjudicate guilt, asserting that Walters had violated the following terms and conditions of his community supervision:[1]

> Defendant failed to report to his community supervision officer at the Montgomery County Community Supervision and Corrections Department [as] directed: CSO [A.G.] instructed defendant to contact

---

[1] We identify the victim, her family members, and witnesses by using initials. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

her by phone on August 20, 2014, to inform her of the address he would stay at for the night. . . .

Defendant failed to refrain from all association, contact and communication, directly or indirectly with victim or victim's family unless authorized by the Court, Defendant's supervising officer, or court ordered treatment provider, to wit: The victim's mother, [J.S.], drove the defendant to the probation office on August 20, 2014. . . .

Defendant failed to refrain from all association, contact and communication, directly or indirectly with victim or victim's family unless authorized by the Court, Defendant's supervising officer, or court ordered treatment provider, to wit: Defendant has communicated with victim's grandmother on more than one occasion since being placed on probation. . . .

Defendant failed to permit the community supervision officer to visit him at his home, to wit: the defendant refused to provide his physical address to CSO [A.G.] on or about August 22, 2014. . . .

Defendant failed to avoid injurious and vicious habits, to-wit: Defendant brought in two knives to his probation office visit on August 22, 2014.

On December 12, 2014, the trial court held a hearing on the State's motion to revoke. Walters pleaded "[n]ot true" to all five of the State's allegations.

Testimony of A.G.

A.G., a probation officer for Montgomery County, testified for the State. A.G. testified that she met with Walters on August 20, 2014, to go over the

3

conditions of his community supervision. A.G. stated that Walters told her that the victim's mother, J.S., drove Walters to his meeting with A.G. that day. A.G. explained that she did not have any information that the court authorized Walters to be with the victim's mother that day. A.G. also testified that, on that same day, Walters did not give her an address at which he would be living, but rather Walters told her that he was going to live on the victim's grandmother's property. A.G. testified that she told Walters he could not live on the victim's grandmother's property because to do so would violate one of the conditions of his community supervision. A.G. stated that Walters then told her "there [were] a couple of places that he could reside" but that he did not know the addresses of them. A.G. said she informed Walters that he needed to locate another place to live and that he needed to call her that evening to let her know where he was going to be living or where he was going to be staying for the night. A.G. testified that she provided her direct phone number to Walters but that she did not receive a call from Walters that night.

A.G. further testified that the next contact she had with Walters was August 22, 2014, when Walters called her. A.G. explained that Walters told her that he was recording their conversation. According to A.G., Walters told her "he had just obtained [her] phone number[,]" but when A.G. "reminded" Walters that her phone

number was on two documents he had, Walters responded "Okay, I am wrong[,]" admitting he was wrong about just having obtained A.G.'s phone number. A.G. testified that Walters never provided her a physical address where he would be staying during his probation. A.G. explained that Walters provided another probation officer, M.H., directions to the location where he would be living. A.G. testified that, during their conversation that day, Walters said he needed her "to know who Bobby Walters is[,]" which A.G. explained she took as a threat.

A.G. explained that she continued the phone conversation with Walters in the presence of J.T., a court liaison officer, and Walters told her "he needed to speak with [her] about him being in some speed[]" and that "'convenience is worth legal[,]'" and A.G. told Walters she did not understand. On cross-examination, A.G. testified that Walters stated "convenience was where he could get legal."

A.G. stated that Walters asked her not to issue a warrant for his arrest, and when A.G. told him again that she needed to know where he was residing, Walters failed to provide an address or a reason why he could not provide an address. A.G. testified that Walters told her he could not provide her with the address. A.G. said that the conversation ended when the phone disconnected and that she was not able to make a home visit to Walters.

A.G. stated that she visited Walters in jail on August 26, 2014, and on October 8, 2014. A.G. testified that on August 26th, Walters told her he was "in medical[]" and he banged on the door to be let out and said "[t]hat [A.G.] was not his attorney and he was lied to." A.G. then described her October 8th visit with Walters, saying Walters asked her if he needed his attorney, and told her that he was not doing well and that he was attacked by another inmate. A.G. also stated that Walters "said there was no 'pre thought' or forethought" and that when she asked him about the offense, Walters said "he had been drinking and apparently said something wrong, 'that's what landed me in here.'"

On cross-examination A.G. said that Walters had told her he had fallen down and injured his head in court on August 19th and that someone else had mentioned this to her as well. A.G. also testified that she was aware that Walters had gone to the jail from the courtroom but was not aware that he had gone to the infirmary. A.G. also explained that, when she met with Walters on August 20th, that A.G. spoke with J.S. to advise her that Walters was not supposed to have contact with J.S. A.G. explained she had informed Walters he needed to move his camper from his ex-wife's property because he was going to live in that camper and because his ex-wife was the grandmother of the victim. When asked why she felt she had to request an order for Walters' arrest, A.G. explained

6

Because when I seen [sic] him on the 20th, I told him that he needed to call me and tell me where he was staying for the night. He didn't contact on the 20th, the 21st. And then on the 22nd when I asked him multiple times, he still never told me.

Testimony of M.H.

The State also called M.H., a probation officer for sexual offenders, as a witness. M.H. testified that she met with Walters on August 22nd, when he showed up at a time when A.G. was out of the office. M.H. explained that when Walters arrived, she saw that he went through the metal detectors, but he asked to go back to his truck to get a soft drink, and when he returned, he did not pass through the metal detectors. M.H. testified that Walters told her he had been staying "in his travel trailer over on Woodpeckers Grove" but that it did not have a physical address. M.H. said she asked Walters why he had not told this to A.G., and Walters responded that he "tried to[]" but then he also admitted he had hung up on A.G. M.H. testified that Walters gave her directions to the location where he was staying. M.H. explained that she did not know where Walters had located his trailer despite her having followed Walters' directions and having attempted to find the location where Walters said his camper was located. M.H. further testified that the Conroe Police Department then arrested Walters, and the police found two pocketknives in Walters' pockets.

Testimony of J.T.

J.T., the court liaison officer for Montgomery County adult community supervision, also testified at the hearing. J.T. testified that on the day Walters entered his guilty plea, she saw Walters fall in the courtroom after entering his plea and that she was told Walters was taken to the infirmary. J.T. explained that she did not talk with Walters about his probation paperwork at that time because he went to the infirmary. J.T. testified that she listened to Walters' phone conversation with A.G. on August 22nd, during which J.T. told Walters she had been unable to go over his conditions of probation because he fell and left the courtroom. J.T. said Walters told her that he had been talking with a retired federal judge and also that the phone call was being recorded. J.T. said she advised Walters that the judge should understand the nature of Walters' offense, which was "very serious," that it was very important Walters comply with the terms of his probation and tell A.G. where Walters was living, and then the phone call disconnected.

On cross-examination, J.T. testified that the terms and conditions of Walters' probation "are standard sex offender conditions[]" along with "the regular terms of probation[.]" She also testified that she never reviewed the conditions of probation with Walters.

<u>Testimony of Walters</u>

Walters testified that he fell and hit his head on the floor on August 19th, the day he was entering his plea. He stated that, in the fall, he hurt his head, his knees, and his elbow, and that he also had cuts on his wrist. Walters explained that he went to the infirmary after his fall because he was bleeding.

According to Walters, his attorney had him sign and initial on the terms of his probation, but his attorney did not go over each of the conditions. Walters denied knowing that when he was released from the jailhouse that he was not supposed to have contact with his daughter, J.S. Walters explained that when he was released, an official at the jail had a "sticky note[]" with a message indicating J.S. had been to the jail and left her phone number and that Walters was to contact her to get a ride home. Walters also stated that when J.S. brought him to the probation office on August 20th, he did not know she was not supposed to do that.

Walters testified that, in his first conversation with A.G., he "gave her an exact location of where the trailer [in which he would be living] would be moved to." He explained that although he did not have "a written 9-1-1 address[,]" he showed A.G. the location on a Key Map. Walters said that after A.G. explained several of the conditions of his probation, she asked Walters how he got to the probation office. Walters said that when he told A.G. that his daughter had brought

him there, A.G. asked if this was a member of the victim's family, and Walters told her "yes, it is my granddaughter's mother." Walters also said that A.G. told him he would have to find another way to get back to his camper and that he had "two minutes to get it off [his] ex-wife's property." Walters explained that while he had been in jail for eight months, his truck had suffered some damage and a lot of work was necessary to move the camper to another location. Walters testified that he parked the camper near a cemetery, and he tried to find out the address of that location, but he was unable to locate an address. Walters explained that, on August 22nd, he attempted to get his truck inspected, but he did not have enough money, so he took some knives from his collection to a pawn shop.

Walters explained that in the phone conversation with A.G., he was having trouble with his cell phone charge and also that he was "in a bad location down in the woods." He testified that when he went to see A.G. on August 22nd, he did not know he was not supposed to have his pocketknives and that the only reason he had the knives was that he was going to take them to the pawn shop. Walters testified that he wished to remain on deferred adjudication and community supervision and explained his conduct as follows:

> I never meant for that to be. But because of the circumstances and because of the stress that I have been under for eight months and knowing that I was fixing to be a free man, per se, and then to be

threatened to have my freedom taken away from me again, I was under a lot of stress. Not to mention the fall in the courtroom at that day. Because up until -- well, even now, I am still suffering from part of it.

On cross-examination Walters admitted he had A.G.'s phone number upon his release from jail, but he claimed that he did not have a phone and that his priority was to get his camper. He testified that, since his fall in the courtroom, he has suffered memory loss and headaches. He explained that he told A.G. and J.T. that he was recording his phone conversation with them because he "felt like [he] was being talked down to and being threatened to having [his] probation revoked[]" and that he felt threatened by "her tone of voice" and because she kept threatening to revoke his probation.

At the conclusion of the hearing, the court found all the allegations true except the allegation that Walters had communicated with the victim's grandmother, adjudicated Walters' guilt of indecency with a child by sexual contact, and sentenced him to imprisonment for ten years and payment of a $2,000 fine. Walters timely filed a notice of appeal.

11

## ISSUE ON APPEAL

In a single issue, Walters challenges the legal sufficiency of the evidence to support the allegations in the State's motion to adjudicate. He argues he "was not given a chance to get his feet underneath him to have a successful probation."

Although Walters does not specifically argue that he was denied due process, his appellate brief generally alleges certain "notice issues[.]" Nevertheless, the brief fails to cite to the record or provide legal authority concerning notice. Accordingly, we need not address "notice issues" as Walters has waived any such argument. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Kelly v. State*, 463 S.W.3d 256, 265 (Tex. App.—Texarkana 2015, no pet.) (declining to address an argument that was inadequately briefed).

## STANDARD OF REVIEW

An appellate court's review of an order adjudicating guilt is generally limited to a determination of whether the trial court abused its discretion. *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 5(b) (West Supp. 2015) ("The determination to proceed with an adjudication of guilt on the original charge is reviewable in the same manner as a revocation hearing conducted under Section 21 in a case in

which an adjudication of guilt had not been deferred."); *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006) ("'Appellate review of an order revoking probation is limited to abuse of the trial court's discretion.'") (quoting *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984)).

In a hearing to revoke deferred adjudication community supervision, the State only needs to prove the violation of a condition of probation by a preponderance of the evidence. *Hacker v. State*, 389 S.W.3d 860, 864-65 (Tex. Crim. App. 2013); *Rickels*, 202 S.W.3d at 763-64; *Cobb v. State*, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993). The evidence meets this standard when the greater weight of the credible evidence creates a reasonable belief that the defendant has violated a condition of his community supervision. *Rickels*, 202 S.W.3d at 763-64 (quoting *Scamardo v. State*, 517 S.W.2d 293, 298 (Tex. Crim. App. 1974)); *Duncan v. State*, 321 S.W.3d 53, 57 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

We must examine the evidence in the light most favorable to the trial court's order. *Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. 1981). In determining whether the allegations in the motion to revoke are true, the trial court is the sole trier of facts, the judge of the credibility of the witnesses, and the arbiter of the weight to be given to the testimony. *Taylor v. State*, 604 S.W.2d 175, 179

(Tex. Crim. App. 1980); *Trevino v. State*, 218 S.W.3d 234, 240 (Tex. App.—Houston [14th Dist.] 2007, no pet.). To support the trial court's order revoking community supervision, the State need only establish one sufficient ground for revocation. *See Moore v. State*, 605 S.W.2d 924, 926 (Tex. Crim. App. 1980).

ANALYSIS

One of the alleged violations of the terms and conditions of Walters' community supervision was that

> Defendant failed to report to his community supervision officer at the Montgomery County Community Supervision and Corrections Department [as] directed: CSO [A.G.] instructed defendant to contact her by phone on August 20, 2014, to inform her of the address he would stay at for the night. . . .

As we have already noted, Walters' signature dated August 19, 2014, appears on the terms and conditions of his community supervision. Furthermore, A.G. testified that on August 20, 2014, she informed Walters that he needed to find someplace to live other than on his ex-wife's property, and A.G. directed him to call A.G. that evening to let her know where he was going to be living or where he was going to be staying for the night. A.G. explained that she gave Walters an appointment slip from the Montgomery County Department of Community Supervision and Corrections that included A.G.'s name as well as a direct phone number for her, and the appointment slip reflects Walters' signature. On cross-

14

examination, Walters admitted that the appointment slip had A.G.'s name and phone number and also that Walters had A.G.'s name and phone number. Nevertheless, according to A.G., she did not receive a call from Walters that night. And, A.G. also testified that Walters never explained why he did not call her on August 20th to give her his address.

At the hearing, Walters testified that he knew he had A.G.'s phone number, but he did not have a phone, and he explained that he did not call A.G. as she had instructed him because his "first option that night" was to move his camper and also because calling A.G. "had slipped [his] mind." He admitted that he could have driven somewhere to use a phone.

The State's motion to revoke also alleged that

> Defendant failed to refrain from all association, contact and communication, directly or indirectly with victim, or victim's family unless authorized by the Court, Defendant's supervising officer, or court ordered treatment provider, to wit: The victim's mother, [J.S.], drove the defendant to the probation office on August 20, 2014.

A.G. testified that Walters told A.G. that his daughter, J.S., who was also the victim's mother, drove him to the meeting with A.G. on August 20, 2014. At the hearing, Walters admitted that his daughter drove him to the August 20th meeting with A.G.

As the sole trier of fact, the trial court was entitled to judge the credibility of the witnesses and decide what weight to give their testimony. *See Taylor*, 604 S.W.2d at 179; *Brooks v. State*, 153 S.W.3d 124, 127 (Tex. App.—Beaumont 2004, no pet.). In doing so, the trial court could rely on the community supervision officer A.G.'s testimony and reject Walters' testimony. *See Cherry v. State*, 215 S.W.3d 917, 919-20 (Tex. App.—Fort Worth 2007, pet. ref'd). Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the trial court did not abuse its discretion in concluding that the State proved, by a preponderance of the evidence, that Walters violated at least one of the conditions of his community supervision. *See Rickels*, 202 S.W.3d at 763-64; *see also Cardona*, 665 S.W.2d at 493; *Moore*, 605 S.W.2d at 926. Because the trial court did not abuse its discretion by revoking Walters' unadjudicated community supervision, we overrule Walters' sole issue and affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on August 14, 2015
Opinion Delivered December 9, 2015
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.